D. MARC HAWS
INTERIM UNITED STATES ATTORNEY
MONTE J. STILES
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
WELLS FARGO BANK CENTER
877 WEST MAIN STREET, SUITE 201
BOISE, IDAHO  83702
TELEPHONE:  (208) 334-1211
**MAILING ADDRESS:**
 **BOX 32**
 **BOISE, IDAHO  83707**

UNITED ... COURTS
DISTRICT ... IDAHO

... 200

... M. REC'D
LODGED ... ...

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No. CR-01-52-S-BLW |
| **Plaintiff,** | |
| **vs.** | **SECOND SUPERSEDING INDICTMENT** |
| **JOHN W. ANTHONY, aka "Johnny Blaze";** | |
| **JASON WILLIAM CZECH, aka "Chex";** | 21 U.S.C. § 841(a)(1) |
| **BRANDON ALEXANDER LONG;** | 21 U.S.C. § 841(b)(1)(A) |
| **SAMUEL G. LEMAR, aka "Sambo" aka "Moose";** | 21 U.S.C. § 841(b)(1)(B) |
| **DIRK WARREN DEGROOT;** | 21 U.S.C. § 846 |
| **GREGORY LEE FRY;** | 21 U.S.C. § 856 |
| **PRESTON RANDALL ECKMAN;** | 21 U.S.C. § 853 |
| **COREY ADAM SCHWAB;** | |
| **PAUL ROBERT STRAITT, aka "Froggy";** | |
| **JAMES LEE COLLINS, aka "Jaime""James Dean";** | |
| **EDUARDO CABELLO, aka "Eddie";** | |
| **JESSE WARREN BYERLY;** | |
| **JARED WRIGHT ANDERSON;** | |
| **JUSTIN MUNOZ;** | |
| **RYAN O. GITTENS, aka "Fury";** | |
| **CHAD MIKITAROFF,** | |
| **Defendants.** | |

**The Grand Jury charges:**

## At all times relevant to this Superseding Indictment:

3,4 - Methylenedioxymethamphetamine (MDMA, Ecstasy) is a Schedule I controlled substance. It is commonly referred to as *Ecstasy, E, and XTC*. MDMA is a synthetic drug with both stimulant and psychedelic/hallucinogenic properties. MDMA possesses chemical variations of the stimulant methamphetamine and a hallucinogen, most often mescaline. It is typically sold in pill form.

Lysergic Acid Diethylamide (LSD) is a Schedule I controlled substance which has hallucinogenic properties. It is commonly referred to as *acid, Vitamin A, fry, A, and CID*. It is typically sold in liquid form, on perforated papers, or on candy. In its liquid form, it is often contained in breath freshener squeeze bottles.

Ketamine is a Schedule III controlled substance commonly referred to as *Special-K, Super-K, Vitamin K and K*. It has sedative-hypnotic, analgesic, and hallucinogenic properties. It is marketed in the United States and a number of foreign countries for use primarily as an animal tranquilizer. It is typically sold in pill form.

3,4-methylenedioxyamphetamine (MDA) is Schedule I controlled substance which is chemically similar to MDMA (Ecstacy). It is a synthesized chemical variation of mescaline and amphetamine.

Cocaine is a schedule II controlled substance with central nervous system stimulant properties. It is typically sold in powder form.

"Club drugs" is a collective term used for a wide variety of drugs which include MDMA (Ecstasy), LSD, MDA, ketamine, cocaine, methamphetamine, and others.

CI-1 is a confidential informant who has worked on behalf of the Federal Drug Enforcement Administration (DEA) and the Boise City Police Department to uncover ongoing drug crimes, especially those relating to club drugs.

CI-2 is a confidential informant who has worked on behalf of the Federal Drug Enforcement Administration (DEA) and the Boise City Police Department to uncover ongoing drug crimes, especially those relating to club drugs.

**SECOND SUPERSEDING INDICTMENT - 2**

1    Undercover Police Detective 1 is a Boise City Police Detective who is assigned to the Boise

2  Area Narcotics Drug Interdiction Task Force (BANDIT).

3    Undercover Police Detective 2 is a Boise City Police Detective who is assigned to the Boise

4  Area Narcotics Drug Interdiction Task Force (BANDIT).

5    Undercover Police Detective 3 is a Meridian City Police Detective who is assigned to the

6  Boise Area Narcotics Drug Interdiction Task Force (BANDIT).

7    Undercover Police Detective 4 is a Special Agent with the Federal Drug Enforcement

8  Administration (DEA) who is assigned to investigate violations of federal drug laws in Idaho.

9    Ecliptic B.A.S.E. is a company owned and operated by James Lee Collins, aka "Jaime" aka

10  "James Dean." Through this business, Collins operates as a promoter of RAVE dance parties. The

11  business also involves the sale of drugs to patrons of the RAVEs.

12                              **COUNT ONE**

13                   **Conspiracy to Distribute Controlled Substances**

14         **Including 3,4 - Methylenedioxymethamphetamine (MDMA, Ecstasy),**
     **Lysergic Acid Diethylamide (LSD), 3,4 - Methylenedioxyamphetamine (MDA),**
15                        **Ketamine and Cocaine**

16                   **(21 U.S.C. §§ 846, 841(b)(1)(A))**

17    That from an unknown date, but existing at least between May 2000 and the date of the filing

18  of this Superseding Indictment, within the District of Idaho and elsewhere, **JOHN W. ANTHONY,**

19  **aka "Johnny Blaze"; JASON WILLIAM CZECH, aka "Chex"; BRANDON ALEXANDER**

20  **LONG; SAMUEL G. LEMAR, aka "Sambo" aka "Moose"; DIRK WARREN DEGROOT;**

21  **GREGORY LEE FRY; PRESTON RANDALL ECKMAN; COREY ADAM SCHWAB;**

22  **PAUL ROBERT STRAITT, aka "Froggy"; JAMES LEE COLLINS, aka "Jaime" aka "James**

23  **Dean"; EDUARDO CABELLO, aka "Eddie"; JESSE WARREN BYERLY; JARED**

24  **WRIGHT ANDERSON; JUSTIN MUNOZ; RYAN O. GITTENS, aka "Fury"; and CHAD**

25  **MIKITAROFF,** defendants herein, did combine, conspire, confederate and agree with each other,

26  and with other persons, both known and unknown to the Grand Jury, to distribute and possess with

27  the intent to distribute controlled substances, including but not limited to:

28  3,4 - Methylenedioxymethamphetamine (MDMA, Ecstacy), a Schedule I controlled substance,

SECOND SUPERSEDING INDICTMENT - 3

1  Lysergic Acid Diethylamide (LSD), a Schedule I controlled substance, ketamine, a Schedule III

2  controlled substance, 3,4 - Methylenedioxyamphetamine (MDA), a schedule I controlled substance,

3  and cocaine, a schedule II controlled substance, in violation of Title 21, United States Code, Sections

4  846, 841(a)(1), and 841(b)(1)(A).

## OVERT ACTS

6      In furtherance of the conspiracy, and to effect the objects thereof, in the District of Idaho and

7  elsewhere, and on or about the dates set forth below, one or more of the defendants or their

8  co-conspirators committed, or caused to be committed, overt acts, including, but not limited to the

9  acts set forth in Counts Two through Fifteen, and the following:

10  01.    On or about February 4, 2001, during an undercover police operation at a Rave dance party

11      ("Pscience Fiction"), Undercover Police Detective 1 witnessed Brandon Long exchange pills

12      for money with a number of Rave participants. After approaching Long, Long sold 6 tablets

13      of Ecstasy to Undercover Police Detective 1. *See Count Two.*

14  02.    On or about February 15, 2001, John W. Anthony ("Blaze") had a conversation with CI-1

15      about Anthony going to Las Vegas, Nevada, to obtain drugs. Anthony told CI-1 that he

16      needed to see CI-1's money before making the trip.

17  03.    On or about February 19, 2001, John W. Anthony ("Blaze") made arrangements to travel to

18      Las Vegas to pick up 60 vials of liquid LSD.

19  04.    On or about February 19, 2001, John W. Anthony ("Blaze") moved from 3904 Pershing,

20      Boise, Idaho, to 1123 Lee Street, Boise, Idaho (the residence of Samuel Lemar, aka

21      "Sambo").

22  05.    On or about February 20, 2001, John W. Anthony ("Blaze") met with CI-1 and Undercover

23      Police Detective 2 in order to see the $4,000 that was available for the purchase of drugs

24      which Anthony planned to obtain from his sources in Las Vegas, Nevada.

25  06.    On or about February 22, 2001 (which was the date John W. Anthony ("Blaze") had intended

26      to fly to Las Vegas to obtain Ecstasy), Anthony called Undercover Police Detective 2 to tell

27      him that Anthony's Las Vegas source of Ecstasy had arrived in Boise with the drugs and that

28      Anthony was prepared to complete the deal that day. At approximately 6:25 p.m., Anthony

**SECOND SUPERSEDING INDICTMENT - 4**

1   and Brandon Long left Long's residence at 1519 Owyhee, Boise, Idaho, to meet Undercover

2   Police Detective 2 and Undercover Police Detective 3. Anthony and Long traveled to the

3   meeting in Long's Honda CRX with Idaho license plate "RAVER". At the meeting, Anthony

4   and Long checked the Undercover Police Detectives for surveillance equipment. Anthony

5   and Long then sold the detectives approximately 265 pills of Ecstasy for $4,000. Anthony

6   and Long then traveled back to Long's residence. *See Count Three.*

7   07.   On or about March 6, 2001, John W. Anthony ("Blaze") sold approximately 43 pills of

8        Ecstasy to CI-1 for $980. Although Anthony claimed that these pills were Ecstasy, at least 6

9        of the tablets contained a different drug, MDA. During a subsequent traffic stop of the

10       vehicle containing Anthony, Anthony was in possession of $1,285, which included the $980

11       used to purchase the Ecstasy. *See Counts Four and Five.*

12   08.   On or about March 6, 2001, John W. Anthony ("Blaze") and Samuel Lemar ("Sambo")

13       offered to sell CI-1 10 vials of liquid LSD for $1,000.

14   09.   On or about March 13, 2001, John W. Anthony ("Blaze") agreed to sell one vial of liquid

15       LSD to CI-1 for $250.

16   10.   On or about March 19, 2001, John W. Anthony ("Blaze") agreed to sell liquid LSD to CI-1.

17       When CI-1 arrived at John W. Anthony's house (now 1207 Lincoln Street, Boise, Idaho),

18       Anthony was not in possession of liquid LSD; instead, Anthony had LSD for sale which had

19       been placed on Pez candies. Because CI-1 had only been authorized to purchase liquid LSD,

20       the sale did not occur.

21   11.   On or about March 27, 2001, John W. Anthony ("Blaze") and Jason Czech ("Chex") sold one

22       vial of liquid LSD (approximately 50 "hits") to CI-1 and Undercover Police Detective 2 for

23       $250. The LSD was contained in a Sweet Breath brand breath freshener squeeze bottle. This

24       transaction occurred at defendant Anthony's residence (1207 Lincoln). Following the

25       transaction, Anthony showed Undercover Police Detective 2 a tray containing several

26       hundred (200-300) "Pez" candies which Anthony had dosed with liquid LSD. Anthony and

27       Czech told CI-1 and Undercover Police Detective 2 that they were going to make a trip to

1  Portland to pick up enough LSD to make 100 vials. Czech also talked about buying crystal

2  LSD and converting it to liquid. *See Count Six.*

3  12.  On or about April 3, 2001, John W. Anthony ("Blaze") called CI-1 and told him that he

4  (Anthony) was anxious to sell CI-1 some of the LSD that Anthony had brought back from

5  Portland. Anthony said he could sell 10 vials of liquid LSD for $1,500. Subsequently,

6  Anthony and Jason Czech ("Chex") sold nine vials of liquid LSD (approximately 900 "hits")

7  to Undercover Police Detectives 2 and 3 and CI-1 for $1,500. The LSD was contained in

8  Sweet Breath brand breath freshener squeeze bottles. This occurred at 1207 Lincoln Avenue,

9  Boise, the residence of Anthony and Czech. During the sale, Anthony and Czech told

10  Undercover Police Detectives 2 and 3 and CI-1 that they had picked up 30 vials of LSD on

11  their last trip to Portland, that they were going back that weekend to pick up additional

12  amounts, that they had a "solid connection" in Portland, and that it would be easy to get a lot

13  more in the future. Czech asked Undercover Police Detective 2 for help in obtaining a "38

14  roller" (.38 caliber revolver). Czech then showed Undercover Police Detective 2 a baggie of

15  marijuana and gave Undercover Police Detective 2 a large bud of it. As CI-1 and the

16  Undercover Police Detectives were leaving, Czech asked if Undercover Police Detective 2

17  could purchase 60 vials of LSD at $125 a vial, with the possibility of making future

18  purchases at $90 per vial. *See Count Seven.*

19  13.  On or about April 13, 2001, John W. Anthony ("Blaze") and Jason Czech ("Chex") sold

20  thirteen vials of liquid LSD (approximately 1,300 "hits") to Undercover Police Detectives 2

21  and 3 for $2,000. The LSD was contained in Sweet Breath brand breath freshener squeeze

22  bottles. This occurred in Anthony's bedroom at 1207 Lincoln Avenue. During the sale, a

23  two year-old female child was present. Anthony and Czech said that their sources of LSD in

24  Portland were going on a cross country trip and would be gone for some time, but that they

25  had another source for LSD in Boise. Anthony said that he could obtain as many Ecstasy

26  pills as Undercover Police Detective 2 wanted, at $10 per pill. Czech told Undercover Police

27  Detective 2 that he had a friend who was interested in purchasing a mini-Glock 9mm firearm

28  and that the friend would be willing to trade drugs for the gun. *See Count Eight.*

**SECOND SUPERSEDING INDICTMENT - 6**

14. On or about April 23, 2001, John W. Anthony ("Blaze") requested the assistance of CI-1 in moving out of his residence at 1207 Lincoln.

15. On or about April, 25, 2001, Jason Czech ("Chex") talked to CI-1 about a large Ecstasy deal. Czech subsequently called Portland to make the arrangements.

16. On or about April 25, 2001, Samuel Lemar ("Sambo") approached CI-1 to initiate sales of drugs.

17. On or about April 27, 2001, Jason Czech ("Chex") called off the large Ecstasy deal (overt act 15) because he was unable to obtain the pills at that time.

18. On or about May 3, 2001, Samuel Lemar ("Sambo") and Dirk Degroot sold 80 Ecstacy pills and three pills of ketamine to Undercover Police Detective 3 and CI-1 for $1,550. (Although the 80 pills were purported to be Ecstacy, the pills actually contained four different drugs: Ecstasy (MDMA), MDA, d-methamphetamine, and methorphan.) Lemar asked Undercover Police Detective 3 if he could obtain a firearm for Lemar to use as protection in his bigger drug deals. Lemar stated that he would be willing to trade drugs for the gun. Lemar told Undercover Police Detective 3 that he would be able to do a 500 pill deal and then work into a 1,000-pill deal in the future. Lemar said his source of drugs (who carried a gun) was from Las Vegas. Lemar also talked about Anthony and Czech, claiming that Czech owed him money and that Lemar wanted to "shoot him" (Czech) and "bury him in the desert". Lemar also said that he had warned his roommate and partner "Preston" (Eckman) to quit dealing with Czech. *See Counts Nine and Ten.*

19. On or about May 16, 2001, Ryan Gittens (Fury) and Chad Mikitaroff transported approximately 6 ounces of cocaine from Las Vegas to Boise, Idaho. *See Count Eleven.*

20. On or about May 16, 2001, Brandon Long talked to CI-1 at Julia Davis Park. Long advised CI-1 that Long's source of drugs in Las Vegas had carried 6 ounces of cocaine to Boise on an airplane. Long asked CI-1 if he was interested in purchasing cocaine and arranged for CI-1 to call Preston Eckman the next day. *See Count Eleven.*

21. On or about May 17, 2001, Greg Fry and Preston Eckman sold one-quarter pound of cocaine to Undercover Police Detective 2, CI-1, and another Undercover Police Detective for $2,800.

**SECOND SUPERSEDING INDICTMENT - 7**



During the transaction, Fry advised Undercover Police Detective 2 that his Las Vegas source for Ecstasy and ketamine was "solid" and that he could have $2,000 worth of ketamine for Undercover Police Detective 2 by Friday. Fry also asked Undercover Police Detective 2 if he would be willing to supply assault weapons--Mac-10s, Tec-9s--in exchange for drugs. Fry stated that his drug source in Las Vegas was also interested in a lot of guns. Future trips to Las Vegas in order to purchase larger quantities of drugs were also discussed. *See Count Eleven.*

22.    On or about May 23, 2001, Brandon Long approached CI-1 at Julia Davis Park in Boise and asked if the cocaine deal had gone well.

23.    On or about May 23, 2001, Samuel Lemar ("Sambo") told CI-1 that he had been burglarized recently by a drug user named Troy and that $3,500 in cash, one-quarter pound of marijuana, and (psilocybin) mushrooms were taken.

24.    On or about May 25, 2001, Greg Fry contacted CI-1 and told him that 500 pills were in Boise and that they were willing to do the deal. (Because of a shortage of law enforcement manpower at the time, the transaction did not occur.)

25.    On or about May 30, 2001, CI-1 received a telephone call from Greg Fry. During this call, Fry and CI-1 talked about meeting so they could discuss and conduct a transaction involving 50 pills of Ecstacy for $22 per pill. Fry stated that he normally had to charge others $25 per pill. Fry could not give CI-1 a better deal than $22 per pill because the prior week his guys had flown up from Las Vegas in order to deliver Ecstacy to CI-1. When the deal fell through, it cost Fry money and he needed to make up the costs associated with that trip. Fry also told CI-1 that he was arranging to have one quarter pound of marijuana delivered to himself.

26.    On or about May 30, 2001, Samuel Lemar ("Sambo") and Greg Fry sold 50 tablets of Ecstasy to Undercover Police Detective 2 and CI-1 for $1,200. Both Fry and Lemar indicated that they wanted Undercover Police Detective 2 and CI-1 to travel with them to Las Vegas to purchase 1,000 hits of Ecstasy from their source of supply. Fry and Lemar stated that they would meet with the same people who had flown to Boise the previous week. Lemar and Fry

1   told CI-1 that they were charging him more for the Ecstasy this time because they had to

2   cover the costs of their people flying to Boise the previous week. *See Count Twelve.*

3   27.   On or about June 8, 2001, CI-1 placed a telephone call to Preston Eckman. During the call,

4         CI-1 informed Eckman that he would be leaving town, and that while he was gone, Mr. "A"

5         (Undercover Police Detective 2) and his boy "Mike" (Undercover Police Detective 4) would

6         be handling business. CI-1 told Eckman that it would be "business as usual". Eckman asked

7         if that meant that Mr. "A" and his boy would want "dinner rolls" (slang for Ecstacy). CI-1

8         stated "yes" and that they would also be placing orders for "coca cola" (cocaine). CI-1 told

9         Eckman that Mr. "A" and his boy had CI-1's cell phone and that Eckman could contact them

10        using that number to do business.

11  28.   On or about June 9, 2001, Undercover Police Detective 4 received a telephone call from Greg

12        Fry about Fry's desire to purchase weapons and sell additional drugs. Fry told Undercover

13        Police Detective 4 that he had been at a residence in Garden City when three unknown males

14        showed up and tried to beat him, Samuel Lemar, and Preston Eckman. Fry said that during

15        the scuffle, he chased one of the men down the street with "nunchucks". At some point, the

16        individual Fry was chasing turned and pulled a handgun on Fry. Fry immediately departed

17        the area. Fry further said that $600 had been taken from Lemar and that an unknown quantity

18        of Ecstacy pills had been taken from Fry during the scuffle. Fry agreed to call Undercover

19        Police Detective 4 the following evening about the future drug/firearm transaction.

20  29.   On or about June 14, 2001, Greg Fry called Undercover Police Detective 4. Fry stated that he

21        was paranoid about what was happening in the Boise area and that he needed to meet with

22        Undercover Police Detectives 2 and 4 in a biker clubhouse to have a beer and discuss the

23        matter further. Fry said that he was nervous in part because a buddy of his had just been

24        arrested "down south". Fry also discussed the future purchase of weapons, stating that he

25        wanted a Glock, a Sig Sauer, and an Intertec. Fry told Undercover Police Detective 4 that he,

26        Eckman, and Lemar all worked together, but that Fry was the one with the "hookup". Fry

27        indicated that this hookup was made through Brandon Long. Fry agreed to make further

28        contact on June 15, 2001.

**SECOND SUPERSEDING INDICTMENT - 9**

30.  On or about June 18, 2001, at approximately 4:00 p.m., CI-2 and Jared Anderson (Las Vegas) had a phone conversation regarding past and future drug deals and John Anthony being in jail. Anderson told CI-2 that they were still waiting for some LSD to come into Las Vegas. Anderson also said that drugs would not be sent to Boise until Sambo "pays up" on a drug debt owed to Chad (Mitikaroff). Fury (Ryan Gittens) was identified as the person who would conduct the next drug transaction with CI-2.

31.  On or about June 18, 2001, at approximately 9:47 p.m., CI-2, Jared Anderson and Fury (Ryan Gittens) had a phone conversation regarding the next drug transaction. Fury wanted to know how much money CI-2 had. Fury told CI-2 that he could obtain the drugs cheaper if CI-2 came to Las Vegas. Fury insisted on getting the money first. Fury said that he would call his guy and get a price.

32.  On or about June 18, 2001, at approximately 10:35 p.m., CI-2, Jared Anderson and Fury (Ryan Gittens) talked again by phone. Fury wanted to know if CI-2 could send someone to Las Vegas to pick up the drugs. The cost would be $9,000 for a transaction in Las Vegas or $10,000 to have the drugs delivered to Boise, plus the cost of a plane ticket. Fury stated that he could have an inconspicious female bring the Ecstasy to CI-2 in Boise after CI-2 sent the money. Fury and CI-2 also talked about Sambo being at the Rainbow Family gathering in order to obtain some LSD so that he could pay off his debt to Chad.

33.  On or about June 19, 2001, at approximately 11:45 p.m., Chad Makiteroff and CI-2 talked by phone about CI-2 obtaining the title for Chad's car at the DMV in Boise. They also talked about Sambo owing Chad $1,000 ($10 per pill) and the fact that Sambo was at the Rainbow Family gathering to obtain LSD so he could pay Chad back. Chad said that they would not deal with Sambo anymore. Chad admitted that Jared (Anderson) had talked to him about the upcoming drug deal involving Fury, but Chad did not want to discuss anything until he got some money from CI-2. Chad said that as soon as he got the money, Fury and everyone would start business again. Chad told CI-2 that he (CI-2) would make more money in the long run by paying off Sambo's debt, but to otherwise send the money and do a deal with

1    Fury. Chad said that Sambo had already sent him $400 for Ecstasy and that he still owed
2    Chad $1,000.

3  34.  On or about June 19, 2001, at approximately 3:00 p.m., CI-2 called Justin Carr at his
4      residence located at 1707 Bedford, Boise, Idaho. CI-2 asked Justin to tell Jaime (James
5      Lee) Collins to call him. Justin agreed. Several hours later, CI-2 called the residence at 1707
6      Bedford and spoke to Jaime Collins. CI-2 asked Collins if he wanted CI-2 to "push pills" for
7      him at the RAVE party Collins was promoting for Friday (Evolution). Collins agreed. CI-2
8      then asked how he should contact Collins. Collins told CI-2 to contact him on Friday at the
9      party.

10 35.  On June 20, 2001, at approximately 2:10 p.m., Fury and CI-2 had a phone conversation
11     regarding CI-2 paying off Sambo's debt. When CI-2 expressed concern about getting burned,
12     Fury said that CI-2 would not be burned because it was not between "you and us", it was
13     between "Sambo and them". Fury stated that he had talked to his guy who will supply the
14     drugs. Fury says that the pills are always good. CI-2 can come to Las Vegas, pick up the
15     drugs and leave. CI-2 told Fury that he will wire $1,000 for Sambo's debt. Fury told CI-2
16     that he could supply additional pills after CI-2 sold the ones provided by Fury.

17 36.  On June 20, 2001, at approximately 3:51 p.m., CI-2 called Chad Mitikaroff at 702-250-6400
18     and discussed the payment of $1,000 toward Sambo's debt to Chad. Chad said that amount
19     would be sufficient. CI-2 asked if Fury had talked to Chad about this. Chad said yes.

20 37.  On the afternoon of June 20, 2001, CI-2 visited the "drum circle" at Julia Davis Park. While
21     there, he spoke to Paul Robert Straitt, aka "Froggy", about the purchase of LSD later in the
22     day. CI-2 agreed to return to the drug circle later in the day for the purchase.

23 38.  On June 20, 2001, at approximately 8:25 p.m., CI-2 received a phone call from someone at
24     the drum circle who told CI-2 to hurry because "Froggy" was leaving.

25 39.  On June 20, 2001, at approximately 10:00 p.m., CI-2 traveled back to the drum circle and met
26     with Straitt (Froggy) and Corey Schwab, who was Straitt's source of supply for the LSD.
27     Schwab told CI-2 that he wanted to do the deal in a different part of the park. Straitt and
28     Schwab then drove their vehicle to another part of the park. Schwab got out of the car and

SECOND SUPERSEDING INDICTMENT - 11

1   sold CI-2 4 vials of LSD for $1,000. The LSD was contained in Sweet Breath brand breath
2   freshener squeeze bottles. During the transaction, Schwab told CI-2 that the LSD was good
3   and that it was called "Rainbow Fluff." Straitt and Schwab then left the area in Schwab's
4   Mazda pickup.

5   40. On June 21, 2001, at approximately 1:00 p.m., CI-2 called Jared Anderson's house in Las
6       Vegas. Anderson's mother said that she had kicked Jared and Fury out and that CI-2 need to
7       call Justin's (Munoz) cell phone to reach them (250-5743).

8   41. On June 21, 2001, at approximately 1:05 p.m., CI-2 called Justin Munoz' cell phone to speak
9       with Jared Anderson about sending the money that Sambo owed Chad Mikitaroff for drugs.
10      Justin stated that Jared was at work and that he could provide CI-2 with any information
11      needed. When CI-2 said that he needed to immediately send Jared and Fury money, Justin
12      asked CI-2 what information CI-2 needed to make the money wire happen. When CI-2
13      mentioned paying off someone's debt, Justin said "You paying Sambo's $1,000 or all the
14      money Sambo owes Chad?" According to Justin, Chad told him on the previous night that
15      CI-2 was going to send him $1,000 and that CI-2 wanted a "B" (boat = 1,000 pills of
16      ECSTASY). When CI-2 told Justin that he really wanted to set up the purchase of a boat for
17      the next week, Justin asked if "we were coming up there or if someone was coming down
18      here." CI-2 said it was "up to you". Justin then said that Chad would want CI-2 to come
19      down there because it was easier for "us". When CI-2 told Justin that he was not leaving the
20      airport if he went to Las Vegas, Justin replied by saying "That is easy, all we do is bring it to
21      the airport and meet at Starbucks coffee shop and do our business and then you can go
22      home."

23  42. On the afternoon of June 21, 2001, CI-2 traveled to a grocery store located on State Street in
24      Boise and wired $1,000 of Sambo's drug debt, via Moneygram, to Jared Anderson in Las
25      Vegas. (Minus a handling fee the total sent was $930).

26  43. On June 21, 2001, at approximately 2:28 p.m., CI-2 called Jared Anderson, Justin Munoz and
27      Fury (Gittens) at 702-431-4453 to see if Jared picked up the money CI-2 sent for the drugs.
28      Jared said that he did not because Chad took all of his identification and other property. CI-2

**SECOND SUPERSEDING INDICTMENT - 12**

1    was told to resend the money in someone else's name. Fury told CI-2 to bring Chad's car

2    title to Vegas when he came. Justin Munoz yelled at CI-2 regarding the title to Chad's car.

3    Fury said that Jared couldn't get CI-2's money because Chad took his ID, however, the deal

4    was still on for next week.

5   44.   On June 21, 2001, at approximately 3:40 p.m., CI-2 called Chad Mikitaroff to discuss

6    Sambo's debt. A person who identified himself as Justin (Justin Munoz) told CI-2 that he

7    was Chad's "boy" and that Chad was under the influence and could not come to the phone.

8    When CI-2 told Justin that he wanted to send Chad money, Justin tried to talk to Chad, telling

9    him that he needed to get on the phone because it would help business. Justin then told CI-2

10    that Chad was so under the influence that he could not have a conversation at that time.

11    Justin then told CI-2 to call at a later time.

12   45.   On June 22, 2001, at approximately 1:16 p.m., CI-2 called 702-431-4453 and spoke to Jared

13    Anderson about Chad's car title. Fury then got on the phone and discussed CI-2 sending the

14    money and doing the deal on Thursday. Details of the transaction were discussed. CI-2

15    would pay $9500. Fury wanted the money separated into the amounts of $1,500 and $8,000

16    because the $8,000 had to go to someone else.

17   46.   On June 22, 2001, at approximately 4:53 p.m., CI-2 called 702-431-4453 and spoke to Fury

18    about the deal on Thursday. Fury gave CI-2 advice about transporting the drugs on the plane.

19    Fury said the pills were "white blair witches and ninja stars" in two ziplock bags.

20   47.   On June 23, 2001, at approximately 7:00 p.m., CI-2 called Fury at 702-739-6747. Fury said

21    the price would be $10,000 for "blair witches", "double stack". Fury said that last time he

22    brought 500 pills and 6 ounces of cocaine stuffed in his sock. Fury questioned CI-2 about the

23    Boise airport and commented that dogs cannot smell the stuff. They also talked about the

24    Vegas airport and meeting at Starbucks.

25   48.   On or about June 24, 2001, Jaime Collins, Eduardo Cabello and Jesse Byerly were involved

26    in a RAVE called Evolution, which was held at Skateworld in Boise. During this RAVE,

27    Collins, Cabello, and Byerly distributed Ecstacy, including 54 "yin and yang" Ecstasy pills to

28    CI-2 for $1,000. *See Counts Fourteen and Fifteen.*

**SECOND SUPERSEDING INDICTMENT - 13**

49.   On or about June 24, 2001, at approximately 2:28 p.m., CI-2 received a telephone call from Jared Anderson and Fury who told CI-2 that CI-2 needed to re-wire the $1,000 sent to Anderson because Anderson's identification had been taken away. CI-2 was instructed to resend the money to Fury using the name Ryan Gittens.

50.   On June 26, 2001, CI-2 traveled to a grocery store located on Broadway in Boise and resent Sambo's debt of $1,000 to Ryan Gittens (Fury).

51.   On July 3, 2001, at approximately 4:35 p.m., CI-2 called Jaime Collins at his residence located at 1707 Bedford Drive. CI-2 asked Collins if Collins had any pills. Collins said "not right now" but that he would have some in a couple of days (towards the end of the week).

52.   On July 4, 2001, at about 1:30 p.m., CI-2 and Jesse Byerly had a conversation at Julia Davis Park in Boise. During the meeting, Byerly asked CI-2 if he was going to any RAVE parties that weekend. CI-2 stated that he was going to "RISING". When CI-2 asked Byerly who was promoting the party, Byerly stated that Jaime (Collins) and "Phenix Sol" were going in halves for the party.

## COUNT TWO

### Distribution of 3,4 - Methylenedioxymethamphetamine (MDMA, Ecstasy)

### (21 U.S.C. § 841(a)(1))

On or about February 4, 2001, within the District of Idaho, **BRANDON ALEXANDER LONG**, defendant herein, did knowingly and intentionally distribute approximately six tablets of 3,4 - Methylenedioxymethamphetamine ("MDMA, Ecstacy"), a Schedule I controlled substance, to an Undercover Police Detective, in violation of Title 21, United States Code, Section 841(a)(1).

## COUNT THREE

### Distribution of 3,4 - Methylenedioxymethamphetamine (MDMA, Ecstasy)

### (21 U.S.C. § 841(a)(1))

On or about February 22, 2001, within the District of Idaho, **JOHN W. ANTHONY, aka "Johnny Blaze", and BRANDON ALEXANDER LONG**, defendants herein, did knowingly and intentionally distribute approximately 265 tablets of 3,4 - Methylenedioxymethamphetamine

SECOND SUPERSEDING INDICTMENT - 14

(MDMA, Ecstacy), a Schedule I controlled substance, to two Undercover Police Detectives, in violation of Title 21, United States Code, Section 841(a)(1).

### COUNT FOUR

**Distribution of 3,4 - Methylenedioxymethamphetamine (MDMA, Ecstasy)**

**(21 U.S.C. § 841(a)(1))**

On or about March 6, 2001, within the District of Idaho, the defendant, **JOHN W. ANTHONY, aka "Johnny Blaze"**, did knowingly and intentionally distribute approximately 37 tablets of 3,4 - Methylenedioxymethamphetamine (MDMA, Ecstacy), a Schedule I controlled substance, to CI-1, in violation of Title 21, United States Code, Section 841(a)(1).

### COUNT FIVE

**Distribution of 3,4 - Methylenedioxyamphetamine (MDA)**

**(21 U.S.C. § 841(a)(1))**

On or about March 6, 2001, within the District of Idaho, the defendant, **JOHN W. ANTHONY, aka "Johnny Blaze",** did knowingly and intentionally distribute approximately 6 tablets of 3,4 - Methylenedioxyamphetamine (MDA), a Schedule I controlled substance, to CI-1, in violation of Title 21, United States Code, Section 841(a)(1).

### COUNT SIX

**Distribution of Lysergic Acid Diethylamide (LSD)**

**(21 U.S.C. § 841(a)(1))**

On or about March 27, 2001, within the District of Idaho, **JOHN W. ANTHONY, aka "Johnny Blaze", and JASON WILLIAM CZECH, aka "Chex"**, defendants herein, did knowingly and intentionally distribute one (1) vial of liquid Lysergic Acid Diethylamide (LSD) (approximately 50 hits), a Schedule I controlled substance, to an Undercover Police Detective, in violation of Title 21, United States Code, Section 841(a)(1).

1

## COUNT SEVEN

### Distribution of Lysergic Acid Diethylamide (LSD)

### (21 U.S.C. §§ 841(a)(1), 841(b)(1)(A))

On or about April 3, 2001, within the District of Idaho, **JOHN W. ANTHONY, aka "Johnny Blaze", and JASON WILLIAM CZECH, aka "Chex"**, defendants herein, did knowingly and intentionally distribute nine (9) vials of liquid Lysergic Acid Diethylamide (LSD) (approximately 900 hits), a Schedule I controlled substance, to an Undercover Police Detective, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A).

## COUNT EIGHT

### Distribution of Lysergic Acid Diethylamide (LSD)

### (21 U.S.C. §§ 841(a)(1), 841(b)(1)(A))

On or about April 13, 2001, within the District of Idaho, **JOHN W. ANTHONY, aka "Johnny Blaze", and JASON WILLIAM CZECH, aka "Chex"**, defendants herein, did knowingly and intentionally distribute thirteen (13) vials of liquid Lysergic Acid Diethylamide (LSD) (approximately 1,300 hits), a Schedule I controlled substance, to an Undercover Police Detective, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A).

## COUNT NINE

### Distribution of 3,4 - Methylenedioxymethamphetamine (MDMA, Ecstasy)

### (21 U.S.C. § 841(a)(1))

On or about May 3, 2001, within the District of Idaho, **SAMUEL G. LEMAR, aka "Sambo" aka "Moose", and DIRK WARREN DEGROOT**, defendants herein, did knowingly and intentionally distribute approximately 80 tablets of 3,4 - Methylenedioxymethamphetamine (MDMA, Ecstasy), a Schedule I controlled substance, to an Undercover Police Detective, in violation of Title 21, United States Code, Section 841(a)(1).

**SECOND SUPERSEDING INDICTMENT - 16**

## COUNT TEN

### Distribution of Ketamine (Special K)

### (21 U.S.C. § 841(a)(1))

On or about May 3, 2001, within the District of Idaho, **SAMUEL G. LEMAR, aka "Sambo" aka "Moose", and DIRK WARREN DEGROOT**, defendants herein, did knowingly and intentionally distribute approximately three tablets of ketamine (Special K), a Schedule III controlled substance, to an Undercover Police Detective, in violation of Title 21, United States Code, Section 841(a)(1).

## COUNT ELEVEN

### Possession with Intent/Distribution of Cocaine

### (21 U.S.C. § 841(a)(1))

On or about May 16-17, 2001, within the District of Idaho and elsewhere, **SAMUEL G. LEMAR, aka "Sambo" aka "Moose; PRESTON RANDALL ECKMAN, GREGORY LEE FRY; RYAN O. GITTENS, aka "Fury"; and CHAD MIKITAROFF**, defendants herein, did knowingly and intentionally possess with the intent to distribute and/or distribute approximately one-quarter pound of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

## COUNT TWELVE

### Distribution of 3,4 - Methylenedioxymethamphetamine (MDMA, Ecstasy)

### (21 U.S.C. § 841(a)(1))

On or about May 30, 2001, within the District of Idaho, **SAMUEL G. LEMAR, aka "Sambo" aka "Moose", and GREGORY LEE FRY**, defendants herein, did knowingly and intentionally distribute approximately 50 tablets of 3,4 - Methylenedioxymethamphetamine (MDMA, Ecstacy), a Schedule I controlled substance, to an Undercover Police Detective and CI-2, in violation of Title 21, United States Code, Section 841(a)(1).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT THIRTEEN

**Distribution of Lysergic Acid Diethylamide (LSD)**

**(21 U.S.C. §§ 841(a)(1), 841(b)(1)(B))**

On or about June 20, 2001, within the District of Idaho, **COREY ADAM SCHWAB and PAUL ROBERT STRAITT, aka "Froggy"**, defendants herein, did knowingly and intentionally distribute four (4) vials of liquid Lysergic Acid Diethylamide (LSD) (approximately 400 hits), a Schedule I controlled substance, to CI-2, in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(B)

## COUNT FOURTEEN

**Distribution of 3,4 - Methylenedioxymethamphetamine (MDMA, Ecstasy)**

**(21 U.S.C. § 841(a)(1))**

On or about June 23-24, 2001, within the District of Idaho, **JAMES LEE COLLINS aka "Jaime" aka "James Dean"; EDUARDO CABELLO, aka "Eddie"; and JESSE WARREN BYERLY**, defendants herein, did knowingly and intentionally distribute approximately 54 tablets of 3,4 - Methylenedioxymethamphetamine ("MDMA, Ecstacy"), a Schedule I controlled substance, to CI-2, in violation of Title 21, United States Code, Section 841(a)(1).

## COUNT FIFTEEN

**Maintaining A Place for the Purpose of Distributing and/or Using Controlled Substances**

**(21 U.S.C. § 856(a)(1))**

On or about June 23-24, 2001, within the District of Idaho, **JAMES LEE COLLINS aka "Jaime" aka "James Dean"; EDUARDO CABELLO, aka "Eddie"; and JESSE WARREN BYERLY**, defendants herein, did knowingly and intentionally maintain a place, that is: the "Evolution" RAVE party located at the Skateworld roller skating arena, 7360 Bethel Street, Boise, Idaho, for the purpose of distributing and/or using a controlled substance, that is:  3,4 - Methylenedioxymethamphetamine ("MDMA, Ecstacy"), a Schedule I controlled substance, in violation of Title 21, United States Code, Section 856(a)(1).

SECOND SUPERSEDING INDICTMENT - 18

1

## COUNT SIXTEEN

2                                   **Drug Forfeiture**

3                                   **(21 U.S.C. § 853)**

4          As a result of the violations of 21 U.S.C. §§ 841, 846, and 856, as charged in the Superseding

5    Indictment, the defendants, **JOHN W. ANTHONY, aka "Johnny Blaze"; JASON WILLIAM**

6    **CZECH, aka "Chex"; BRANDON ALEXANDER LONG; SAMUEL G. LEMAR, aka**

7    **"Sambo" aka "Moose"; DIRK WARREN DEGROOT; GREGORY LEE FRY; PRESTON**

8    **RANDALL ECKMAN; COREY ADAM SCHWAB; PAUL ROBERT STRAITT, aka**

9    **"Froggy"; JAMES LEE COLLINS, aka "Jaime" aka "James Dean"; EDUARDO CABELLO,**

10   **aka "Eddie"; JESSE WARREN BYERLY; JARED WRIGHT ANDERSON; JUSTIN**

11   **MUNOZ; RYAN O. GITTENS, aka "Fury"; and CHAD MIKITAROFF**, shall forfeit to the

12   United States any and all property, real and personal, tangible and intangible, constituting or derived

13   from any proceeds the said defendants obtained directly or indirectly as a result of the foregoing

14   offenses; and any and all property, real and personal, tangible and intangible, used or intended to be

15   used, in any manner or part, to commit, or to facilitate the commission of, the foregoing offenses, as

16   to which property the defendants are jointly and severally liable.

17

18   **DATED** this 11th day of July, 2001.

19

20                              D. MARC HAWS
                                Interim United States Attorney
21                              By:

22

23                              MONTE J. STILES
                                Assistant United States Attorney
24

25                              **A TRUE BILL:**

26

27
                                FOREPERSON
28

**SECOND SUPERSEDING INDICTMENT - 19**